Filed 10/29/14  Short v. Marcus CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| HARRIET J. SHORT et al., | B246601 |
| Plaintiffs and Appellants, | |
| v. | (Los Angeles County Super. Ct. No. BP112954) |
| MARLENE J. MARCUS, as Trustee, etc., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Mitchell L. Beckloff, Judge.  Affirmed.

Borden Law Office and Alex R. Borden for Plaintiff and Appellant, Harriet J. Short.

Law Office of Lawrence M. Lebowsky and Lawrence M. Lebowsky for Plaintiff and Appellant, Loretta Patakas.

Sacks, Glazier, Franklin & Lodise, Robert N. Sacks, Matthew W. McMurtrey, and Katherine G. McKeon for Defendant and Respondent.

Harriet J. Short (Harriet) and Loretta Patakas (Loretta) (collectively "appellants") appeal from a final judgment (1) denying Harriet's petition for relief under Probate Code section 850[1] concerning transfers of property by the Stanmar Trust (trust); and (2) granting rescission of a consent agreement that Marlene Marcus (Marlene or respondent) sought to enforce through her cross-petition.[2] Appellants also challenge the trial court's denial of their request for attorney fees in connection with the cross-petition.

We affirm the judgment in full.

## CONTENTIONS

Appellants[3] contend that the trial court erred in determining that certain grant deeds that distributed real property from the trust to Marlene were valid. First, appellants contend that the trial court was not permitted to interpret the trust instrument or the actions of Stanley Marcus (Stanley), who signed the deeds, absent a properly noticed cross-petition under section 17200. Without a properly noticed cross-petition seeking interpretation of the trust instrument, appellants argue, they were denied their due process rights. Further, appellants contend, the trial court's interpretation of the transfer as a proper exercise of Stanley's limited testamentary power over trust property was flawed.

As to the trial court's ruling on Marlene's cross-petition, appellants argue that the trial court did not have the power to grant rescission of the consent agreement at issue and therefore erred in ordering the return of Loretta's income producing property in the State of Washington to the trust. Further, appellants argue that the trial court erred in

---

[1]    All further statutory references are to the Probate Code unless otherwise noted.

[2]    Because certain of the family members discussed in this opinion share the same last name, all family members will be referred to by his or her first name. No disrespect to any person is intended.

[3]    The petition was brought by Harriet alone, not Loretta. However, Loretta is named as a respondent in Marlene's cross-petition. Appellants' opening brief refers to both appellants throughout, although the appeal from the petition technically only involves Harriet and Marlene. Loretta is a proper appellant as to the arguments regarding the cross-petition.

2

denying them attorney fees because they were the prevailing parties on the contract claim raised in the cross-petition.

FACTUAL BACKGROUND

**The trust**

Stanley and Betty Marcus (Betty) had six children together: Norman Marcus (Norman); Martin Marcus (Martin);[4] Steven Marcus (Steven); Marlene, Harriet, and Loretta.

Stanley and Betty established the trust in 1983.[5] The trust was fully amended and restated on February 28, 2000. It was funded with Stanley and Betty's community property, which retained its character as community property despite being in the trust. Any separate property in the trust also retained its character, and Stanley and Betty retained their individual rights to remove all or part of their respective separate property at any time. The trust specifically provides: "Notwithstanding anything in our trust to the contrary, when we are serving as Trustees under our trust, either of us may act for and conduct business on behalf of our trust as a Trustee without the consent of any other Trustee."

In addition, Stanley and Betty each had the absolute right to remove as much of their respective interests in the community estate as they requested in writing at any time. Stanley and Betty also retained the right to amend or revoke the trust while they were both alive. Any amendment or revocation was required to be in writing, signed by both of them, and delivered to the trustee. However, the trust provided that "After the death of one of us, this agreement shall not be subject to amendment or revocation."

While they were both living, Betty and Stanley had "no power to direct our Trustee to make gifts of principal or income from the community estate to a third party." However, the trust also provided, in the same section, "Any gift made directly by our Trustee to a third party in violation of these provisions shall be construed as a distribution

---

[4] Martin died on January 8, 2004.

[5] Stanley and Betty are occasionally referred to as "the trustmakers."

made directly to either or both of us, and then a gift from one or both of us to such third party."

The trust contained instructions in the event that Betty or Stanley became disabled. It provided: "A Trustmaker shall be deemed disabled during any period when, in the opinion of two licensed physicians, a Trustmaker is incapacitated or disabled because of illness, age, or any other cause which results in the Trustmaker's inability to effectively manage his or her property or financial affairs." During a period of time when a trustmaker was disabled, the trustee was required to "apply the trust property, including its income, exclusively for our benefit and for our valid obligations . . . ." Upon the disability of Betty, Stanley was to serve as the disability trustee or continue to serve as trustee. In addition, upon the death of Betty, Stanley was to serve as death trustee or continue to serve as trustee. The trust provided that if any trustee became disabled, "We may serve as the only Trustees or we may name any number of Trustees to serve with us." Marlene was named as successor trustee upon the death of both Stanley and Betty.

The trust provided for a specific distribution to Marlene upon the death of both trustmakers, which included "all interest of the trust estate in all real property located on Lincoln Boulevard, Nowita Avenue and/or Palms Boulevard in Venice, California."

Upon the death of the first trustmaker to die, the trust was to be divided into two separate trusts, known as the Marital Trust and the Family Trust. The Marital Trust was to be divided into two shares: Marital Share One, consisting of the survivor's share of the community property and his or her separate property; and Marital Share Two, consisting of the portion of the deceased spouse's community and separate property defined by a formula in the trust geared toward minimizing estate tax liability. The Family Trust would consist of the balance of the deceased spouse's community and separate property (that is, whatever was not placed into Marital Share Two for tax purposes.)

The surviving trustmaker had the right to demand all of the principal from Marital Share One without limitation. The trust provides:

4

"Our trustee shall pay to or apply for the surviving Trustmaker's benefit such amounts from the principal of Marital Share One as the surviving Trustmaker may at any time request in writing.

"No limitation shall be placed on the surviving Trustmaker as to either the amount of or reason for such invasion of principal."

The surviving trustmaker had a general power of appointment as to the assets in Marital Share One:

"The surviving Trustmaker shall have the unlimited and unrestricted general power to appoint, by a valid last will and testament or by a valid living trust agreement, the entire principal and any accrued and undistributed net income of Marital Share One as it exists at the surviving Trustmaker's death. In exercising this general power of appointment, the surviving Trustmaker shall specifically refer to this power.

"The surviving Trustmaker shall have the sole and exclusive right to exercise the general power of appointment.

"This general power of appointment specifically grants to the surviving Trustmaker the right to appoint property to the surviving Trustmaker's own estate. It also specifically grants to the surviving Trustmaker the right to appoint the property among persons, corporations, or other entities in equal or unequal proportions, and on such terms and conditions, whether outright or in trust, as the surviving Trustmaker may elect."

Further, the surviving trustmaker had a limited testamentary power of appointment as to the assets in Marital Share Two:

"The surviving Trustmaker shall have the limited testamentary power to appoint to or for the benefit of our descendants, either by a valid last will and testament or by a valid living trust agreement, all or any portion of the principal and any accrued and undistributed net income of Marital Share Two as it exists at the surviving Trustmaker's death.

"The surviving Trustmaker may make distributions among our descendants in equal or unequal amounts, and on such terms and conditions, either outright or in trust, as the surviving Trustmaker shall determine."

The surviving trustmaker had the same limited power, set forth in identical language, as to the assets in the Family Trust as they existed at the trustmaker's death.

Excluding the specific bequests, article 12 of the trust disinherits Norman, Martin, and Steven, and leaves the property in three equal shares to Marlene, Harriet, and Loretta.

**The first amendment**

On May 11, 2001, Stanley and Betty executed the First Amendment to the Amended and Restated Stanmar Trust Agreement (first amendment). They added the following sentence, clarifying the specific bequest of property to Marlene found in article 7, section 4 of the trust:

> "Such real property shall include 1600 Lincoln Boulevard, 1608 Lincoln Boulevard, 1620/1624 Lincoln Boulevard, 1628 Lincoln Boulevard, 1009 Nowita Boulevard, and 1010 Palms Boulevard, all located in Venice, California."

**The second amendment**

On February 14, 2004, two doctors confirmed that Betty was critically ill and unable to handle her own affairs. On February 18, 2004, while Betty was incapacitated and hospitalized, Stanley and Marlene executed a document entitled Second Amendment to the Amended and Restated Stanmar Trust Agreement (second amendment).

The second amendment acknowledged Betty's disability, as confirmed by two doctors. The document then explained that Stanley was unwilling to act as disability trustee for Betty. Thus, pursuant to the terms of the trust, Marlene became the disability trustee for Betty.[6] The second amendment provided:

> "3. The following sentence shall be added to the end of Article 17, Section 1 of the Amended and Restated Stanmar Trust Agreement; 'Any trustee, acting alone, shall be authorized to sign any document, note, check, deed, lease, or any other instrument on behalf of the trust.'

---

[6] The second amendment cites article 15, section 2(c) of the trust as authority for Marlene's appointment as disability trustee. However, it seems that the correct clause was article 15, section 3(c), which provides that "If [Betty's] disability trustee is unwilling or unable to serve, . . . then the following shall be named as replacement disability Trustees in the order in which their names appear: [¶] *First*, MARLENE J. MARCUS."

"4. In all other respects, the Amended and Restated Stanmar Trust Agreement dated February 28, 2000, as amended by the First Amendment thereto dated May 11, 2001, not amended hereby, shall remain unchanged, and in full force and effect."

**Estate planning meeting**

On February 18, 2004, Stanley met with Donald Fenmore (Fenmore), the attorney who had prepared the second amendment.[7] Angie Miceli, a real estate broker who had worked with the family's properties, was also present, and Fenmore tape recorded the meeting.

At the meeting, Stanley presented a handwritten document to Fenmore that listed the real properties Stanley believed to be held in the Trust and to whom Stanley and Betty wanted those properties to go upon their deaths. Stanley wrote in the margin next to each property which donee he wanted to benefit. With the exception of six properties (which were to benefit Norman and Steven), Stanley wanted Marlene to receive the properties. Stanley orally confirmed his and Betty's intent with respect to these properties to Fenmore at the meeting.

**Execution of grant deeds**

The next day, on February 19, 2004, Stanley and Marlene as trustees of the trust executed deeds transferring the following real properties to Marlene individually: an undivided 100 percent interest in 1600 Lincoln Boulevard, Venice; an undivided 100 percent interest in 1608 Lincoln Boulevard, Venice; 1010 Palms Boulevard, Venice;[8] 1624 Lincoln Boulevard, Venice; and 1009 Nowita, Venice;[9] as well as a 50 percent undivided interest in 1628 Lincoln Boulevard, Venice.

---

**7** Donald Fenmore died in 2010, so he was not a witness at trial.

**8** 1608 Lincoln Boulevard and 1010 Palms Boulevard are actually the same parcel of land. This parcel of land has two street addresses and two assessor parcel numbers.

**9** 1624 Lincoln Boulevard and 1009 Nowita are actually the same parcel of land. This parcel of land has two street addresses and two assessor parcel numbers.

**Betty's death**

On February 25, 2004, Betty died in Los Angeles.

**The third amendment**

On March 8, 2004, Stanley executed a document entitled Third Amendment to the Amended and Restated Stanmar Trust Agreement (third amendment). The third amendment provided for additional properties to be added to the specific bequests to Marlene contained in article 7, section 4 of the trust. Specifically, Marlene was to receive the following distributions:

> "Additionally, such real property shall include 575 W. Gilman (Banning); 1 acre Pennsylvania Avenue (Beaumont); [one-forth] acre Pennsylvania Avenue (Beaumont); Wilson/Sunset lots & acres; 1345 & 1540 6th Street (Beaumont); rear of fire station (Beaumont); 1548 6th Street (motorcycle shop- Beaumont); 1025 6th [Street] (Oasis-Beaumont); 1365 6th Street trailers office & back end of property (Beaumont); 601 W. Gilman house (Banning); 870 W. Ramsey (Banning); 5702 W. Ramsey (Banning); the trust's 50% interest in 2929 W. Ramsey (Banning); 601 W. Gilman Frt (Banning); any and all other real property owned by the Trustors, the Trust, or Stanmar Partners, L.P., located in the Cities of Banning and Beaumont, CA; 1653 Washington/Abbot Kinney--full parcel (Venice); the full parcel located at the northeast corner of Abbott Kinney and Venice Blvd., Venice, CA [APN 4241-036-038]; the Trust's 50% interest in K15 West Lancaster; 1900-12 Lincoln Blvd. (Venice); 708 Washington Street (Venice); 700 Washington Street (Venice); 19235 Ventura Blvd. shopping center (Tarzana)."

The third amendment directed that Marlene, in her sole discretion, should distribute a portion of the net income derived from these real properties to Harriet and Loretta. The third amendment also provided for a distribution of six properties to Norman and Steven.

**Execution of additional grant deeds**

On June 24, 2004, Stanley and Marlene as trustees of the trust transferred to themselves as trustees property located at the northeast corner of Abbot Kinney Boulevard & Venice Boulevard. Then on June 28, 2004, Stanley, as trustee, transferred the property to Marlene.

On July 20, 2004, Stanley and Marlene carried out the same procedure to accomplish a transfer of the following two properties from the trust to Marlene: 700-706 Washington Boulevard, Marina del Rey and 708-716 Washington Boulevard, Marina del Rey. For both transfers, Stanley and Marlene as trustees first deeded the property to themselves, then Stanley deeded the property to Marlene.

On the same day, Stanley also transferred to Marlene the trust's interest in 1900-1912 Lincoln Boulevard, Venice.

**The consent agreement and the Washington State property**

Prior to his death, Stanley and Marlene discussed providing Harriet and Loretta with a source of regular income. Marlene suggested that Stanley purchase an income producing property in the State of Washington, near Loretta's home. Marlene and Stanley concluded that anticipated proceeds of about $750,000 from the sale of a property in Banning, California could be used in an Internal Revenue Code section 1031 tax-deferred exchange to buy such an income producing property to benefit Harriet and Loretta. Prior to his death, Stanley sold the property located in Banning, California as part of the plan. Thereafter, while residing with Loretta in her home in Washington State, Stanley began to look for a replacement property to purchase with funds from the exchange. Stanley planned to give this property to Harriet and Loretta. However, Stanley died on October 7, 2004, before the exchange could be fully completed.

On the day of Stanley's funeral, October 11, 2004, Marlene handed Harriet and Loretta each a large envelope containing the estate planning documents for Stanley and Betty. The envelopes contained copies of the trust and all the amendments, but did not include copies of any grant deeds.

On October 15, 2004, Fenmore telephoned Harriet and Loretta. Fenmore had represented Stanley in his capacity as trustee, and represented Marlene in her capacity as trustee. In the respective telephone calls, Fenmore instructed Harriet and Loretta to sign the documents he intended to fax them or else they would "lose everything."

Immediately after speaking with appellants, Fenmore faxed them each a two-page agreement entitled Consent to Stanmar Trust Documents and Actions (consent

9

agreement). The consent agreement provided that Loretta and Harriet would receive from the trust an identified property in the State of Washington to be purchased with $750,000 of tax-deferred exchange funds. Harriet and Loretta would receive the property free of any estate taxes. In exchange, the consent agreement provided: "[Harriet and Loretta] consent to the below described documents and actions, and will not, directly or indirectly, either individually or together, seek to attack, challenge, invalidate, set-aside, modify, or nullify" eight specified documents, including all of the amendments to the trust, or any other documents signed or any actions taken by Stanley or Betty concerning any of their property.

Both Harriet and Loretta signed and returned the consent agreement to Fenmore. Marlene purchased a property in the State of Washington known as the Columbia River Storage property. Loretta carried out the due diligence on the property prior to its purchase. On November 4, 2004, Marlene as trustee of the trust transferred to Harriet and Loretta in equal shares the Columbia River Storage property. Within one year, Harriet sold her interest in the property to Loretta.

**June 15, 2005 grant deed**

On June 15, 2005, Marlene transferred from the trust to herself an additional property located at 1012 Palms Boulevard, Venice, California.

**PROCEDURAL HISTORY**

**Pretrial briefing**

On October 2, 2008, Harriet filed her petition, captioned Petition for Order: 1. Determining Validity of Second and Third Amendments; 2. Determining Title to Real and Personal Property; 3. For Removal of Trustee and Appointment of Successor Trustee; 4. For an Accounting; and 5. For Double Damages (petition).

In the petition, Harriet argued that the second and third amendments to the trust were invalid because they were not executed by both Betty and Stanley; that the deeds transferring real property from the trust to Marlene were invalid; that Marlene should be removed as trustee for breaching the trust; and that Marlene should be compelled to file an accounting.

10

On January 16, 2009, Marlene filed a Preliminary Response to Petition of Harriet J. Short to Determine Validity of Trust Amendments and to Remove Marlene J Marcus as Trustee Etc. (preliminary response).  On the same day, Marlene filed her Cross-petition for Enforcement of Consent Agreement (cross-petition).

On July 10, 2009, Marlene filed an objection and response to Harriet's petition (response).  In the response, Marlene argued that the second amendment was valid.  She noted that the second amendment was enacted in accordance with the terms of the trust because Marlene was named as disability trustee after Stanley declined to act as disability trustee.  As to the third amendment, Marlene argued that Stanley had the ability to withdraw, appoint, and distribute his community and separate property by valid trust or testamentary document, and that Stanley had certain powers to invade the trust principal.

On December 24, 2009, Harriet and Loretta filed their joint Objections to Cross-Petition of Marlene J. Marcus for Enforcement of Consent Agreement (objections to cross-petition).

On April 20, 2012, three days before trial, the parties filed a joint trial statement. The parties identified 12 contested issues.  Those issues included:

"2.  Are the Second and Third Amendments otherwise valid as estate planning documents by Stanley?

"3.  Is the handwritten document dated February 18, 2004, a valid holograph?

"4.  Are the deeds through which various real properties transferred to Marlene from 2004 on valid?"

Concurrently with the joint trial statement, the parties filed separate trial briefs.

In her trial brief, Harriet argued that the second and third amendments were invalid because Stanley lacked the power to amend or revoke the trust either while Betty was disabled or after she died.  She also argued that the transfers of real property were not authorized under the terms of the trust.

11

Marlene argued in her trial brief that Stanley had various powers of appointment and the power to withdraw community property to make the various gifts that he made to Marlene in the third amendment and the deeds.

**Trial and judgment**

Trial was held on April 23-27, April 30, and May 17, 2012, in Department 5 of the Los Angeles Superior Court, before the Honorable Mitchell L. Beckloff.

On August 1, 2012, the court issued a minute order finding the second and third amendments to be improper and ineffective as amendments to the trust, denying Harriet's request for return of property to the trust, declaring the consent agreement void, and ordering Harriet and Loretta to return the Columbia River Storage property to the trust.

**Statement of decision**

On August 15, 2012, appellants filed a request for statement of decision. On August 21, 2012, the trial court issued another minute order informing the parties that its minute order dated August 1, 2012, "is deemed the court's [TENTATIVE] STATEMENT OF DECISION." On the same date, appellants filed objections to the proposed statement of decision.

On August 30, 2012, Marlene filed her response to the objections to the tentative statement of decision.

On September 10, 2012, appellants filed supplementary objections to the proposed statement of decision.

On September 11, 2012, the trial court issued its statement of decision.

### ***Order on Harriet's petition***

As to Harriet's petition, the court first noted that the trust demonstrated an overall intention that Stanley and Betty maintain extensive freedom over the trust property. Specifically, "the surviving trustor has the authority to determine the ultimate disposition of all of the Trust property. The terms of the Trust allow for unequal distributions to beneficiaries and on such terms and conditions as determined by the surviving trustor." The court further noted that under the uncontested first amendment to the trust, Marlene was to receive "all of the Trust's property on Lincoln Boulevard, Nowita Avenue, and

12

Palms Boulevard in Venice, California." The court held that two of the properties that Harriet sought to be returned to the trust, located on Lincoln Boulevard and Palms Boulevard, were rightfully titled to Marlene pursuant to the first amendment.[10]

The trial court found that the second and third amendments were invalid as amendments to the trust. The only trustor who signed these purported amendments was Stanley, and pursuant to article 4, section 1(d) of the trust, any amendments to the trust were required to be signed by both Stanley and Betty.

However, the court noted that the surviving trustor (Stanley) had testamentary power of appointment rights as to Martial Share Two and the Family Trust. He also had the right to withdraw from Marital Share One at any time and without limitation. The trial court concluded: "Thus, he could withdraw property from Share One of the Marital Trust in any amount and for any reason." As to Stanley's community property share of the properties at issue, he had the specific authority to withdraw his interest in those properties both before and after Betty's death.

As to Betty's community property interest in the properties, Stanley had the specific testamentary authority to appoint which of his and Betty's descendants should receive any share of those properties in Marital Share Two. The court found that through the invalid third amendment, Stanley exercised his limited testamentary power of appointment to distribute Betty's community share in those properties. The court found

_____

[10]    The court indicated that it was not clear from Harriet's petition which specific properties Harriet sought to be returned to the trust. The trial court noted that in 2008, the Superior Court of Los Angeles County, Local Rules, rule 10.24(b) required a notice of hearing in a matter such as this providing a "'description of the subject property sufficient to provide adequate notice to any party who might be interested in the property, and with respect to real property, the street address, or if none, description of the location of the property.'" The court noted that Harriet's petition failed to comply with this rule in that it lacked the specific descriptions of the properties at issue. Based on five lis pendens Harriet filed in connection with the petition, the court understood that Harriet sought the return of at least five properties: (1) 1900-1912 Lincoln Boulevard; (2) 700-706 Washington Boulevard; (3) 708-716 Washington Boulevard; (4) the Northeast corner of Abbot Kinney and Venice Boulevard; and (5) 1012 Palms Boulevard. Appellants have not challenged this finding, therefore it is final.

13

that the invalid third amendment was a "valid living trust agreement." To the extent that the limited power of appointment was not carried out pursuant to the formal requirements of the trust, the court found, section 631 excuses such a failure. The court found that Stanley intended to make a disposition of this property to Marlene, and that such intent could be discerned from the audio recording of his voice that was introduced into evidence. Specifically, the court held:

> "[Stanley's] intent was crystal clear. [Stanley] and [Betty] favored [Marlene] over all of their other children. While [Stanley] had no authority to transfer Marital Trust Share Two to [Marlene] during his lifetime, he did have the complete authority to ultimately accomplish his goal of distributing property to her in her individual capacity. As [Marlene] has assumed all liability for the fees and costs associated with the administration of the Trust, it would be a useless act to have her return to the Trust property from Share Two of the Marital Trust only to have the Trust distribute the property back to [Marlene] pursuant to [Stanley's] limited power of appointment."

Based on the foregoing, the court held:

> "JTD 1: The Second Amendment and the Third Amendment to the Trust are invalid and of no effect as Trust amendments.
>
> "JTD 2: The request that certain parcels of real property be returned to the Trust is DENIED. (The court finds that while [Harriet] sought return of 'cash and other personal property assets' to the Trust 'according to proof at trial' no such property was identified during the trial and no relief as to cash and personal property is granted.)
>
> "JTD 3: The request to remove [Marlene] as trustee is DENIED. The court finds no grounds for removal of [Marlene].
>
> "JTD 4: The request to appoint [Harriet] as Successor Trustee is DENIED.
>
> "JTD 5: The request for bond for [Harriet] is deemed moot.
>
> "JTD 6: [Marlene] is ordered to account. . . .
>
> "JTD 7: The request for double damages against [Marlene] is DENIED.

14

"JTD 8:  [Marlene's] request for costs is GRANTED pursuant to Probate Code section 1002."

The court addressed appellants' objections in a footnote.  The court noted that the "thrust of the Objections is that the court ruled on matters 'not at issue in these proceedings,' and/or relied on facts that were irrelevant based on the pleadings.  The Objections contend that [appellants] were 'denied their due process rights.'"  The court responded that "'[b]ecause this litigation involves claims that [appellants] have rights to property and distributions from the Trust, of necessity this Court had to construe the Trust.'. . .  The issues raised by the pleadings do not exist in a vacuum and must be considered in context.  Moreover, [Marlene's] arguments in her pleadings related to the Trust as a whole."  The court then quoted from certain of Marlene's pleadings, which raised questions of Stanley's intent and the construction of the trust as a whole.

### *Order on Marlene's cross-petition*

As to Marlene's cross-petition for enforcement of the consent agreement, the trial court agreed with appellants' position that the agreement was voidable.  The court also agreed that it was Marlene's burden, as trustee, to demonstrate that the transaction was fair and that the beneficiaries had full understanding of the transaction.  The court found that Marlene "did not meet her burden of demonstrating that the transaction between her, the trustee, and the beneficiaries was a fair one where the beneficiaries had complete knowledge of all of the relevant facts.  (While the transaction ultimately may have been a fair one resulting in [Harriet] and [Loretta] receiving more than they would be entitled to under the Trust, the trustee had an obligation to treat the beneficiaries with the utmost good faith.  The facts surrounding the execution of the Consent Agreement do not support such a finding.)"

However, the court determined that whether the consent agreement was upheld or invalidated, the Columbia River Storage property must be returned to the trust.  If the consent agreement were upheld, the breach provisions clearly provide that Harriet and Loretta are required to immediately return to the trust any property which they have

15

acquired through the use of trust funds. If the consent agreement is declared null and void, the trust is also entitled to return of the property.

The court ultimately held:

"JTD 1: The Consent Agreement is not valid and enforceable.

"JTD 2: [Harriet] and [Loretta] are ordered to transfer the Columbia Storage property to [Marlene] as trustee of the Trust as well as all profits from the property. The court orders an accounting by [Harriet] and [Loretta] for such property. (See below.)

"JTD 3: [Marlene's] request for attorney's fees and costs is DENIED as the Consent Agreement is deemed void.

"[Harriet] and [Loretta's] request in their objections for attorney's fees is DENIED. [Harriet] and [Loretta's] request for costs is GRANTED pursuant to Probate Code section 1002."

On October 22, 2012, the trial court issued its judgment. On November 2, 2012, Marlene served notice of entry of judgment.

**Writ petition and motion for new trial**

On October 9, 2012, appellants filed a writ petition with this court, seeking an order compelling the trial court to overturn its orders expunging the lis pendens that had been filed on the properties. In the writ, appellants argued that the trial court's determinations that Stanley withdrew his community property, and exercised his power of appointment over the trust assets, were beyond the scope of the pleadings. They also argued, as they do here, that the court's interpretation of the trust agreement was incorrect, that the invalid third amendment does not meet the requirements of a valid living trust agreement and that section 631 does not excuse its deficiencies. On this court's request, Marlene filed an informal opposition to the writ on October 19, 2012. On October 30, 2012, this court denied the writ.

On November 19, 2012, appellants filed a motion for a new trial and to vacate the trial court's order. Marlene opposed the motion. Marlene argued that the "Court's

16

conclusion that the issues determined by its Order were properly raised in the pleadings is correct."

On January 2, 2013, the trial court denied the motions for new trial and to vacate the order.

**Notice of appeal**

On January 22, 2013, appellants filed their notice of appeal.

**DISCUSSION**

**I. The court's power to interpret the trust**

Appellants' first argument is that the trial court exceeded its powers by determining: (1) that the grant deeds were valid exercises of Stanley's right to withdraw community property from Marital Share One; (2) that the third amendment was a valid exercise of Stanley's testamentary limited power of appointment over Marital Share Two; and (3) that Betty's community share of these properties would ultimately have been distributed to Marlene through Stanley's power of appointment, therefore it was a useless act to have Marlene return the property to the trust.

Appellants argue that absent a properly noticed motion pursuant to section 17200, the trial court lacked the power to issue orders that required an interpretation of instruments and/or an interpretation of Stanley's actions. Appellants argue that they did not seek the relief that the court granted, and were not put on notice that the court would consider such matters.

*A. Standard of review*

The parties disagree on the standard of review for this issue. Appellants argue that the issue involves the interpretation and application of a statutory scheme to a set of facts, which is subject to de novo review on appeal. (*Community Youth Athletic Center v. City of National City* (2009) 170 Cal.App.4th 416, 427 (*Community Youth*).) Respondent argues that, given the factual determinations necessary to decide this issue, the substantial evidence standard of review applies. Under this standard, as long as the court's factual determinations are supported by substantial evidence, the ruling must be affirmed. (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632 (*Winograd*).)

17

We find that the issue presents a mixed question of fact and law. First, we must determine what issues were presented to, and considered by, the trial court. This is a factual determination reviewed for substantial evidence. We must also determine what issues were properly considered by the court under the statutory scheme. This is a pure question of law, subject to de novo review.

***B. Issues concerning interpretation of the entire trust, and interpretation of Stanley's actions, were raised before the trial court***

We first address appellants' contention that the trial court's interpretation of the trust, and interpretation of Stanley's intent in carrying out the acts at issue, were beyond the scope of the parties' pleadings, were not tried, and therefore were not in the court's power to determine. In sum, we find that the issues of construction of the trust agreement, and Stanley's intent in carrying out the transfers of property before his death, were raised and discussed before the trial court with ample notice to appellants.

In Harriet's initial pleading, she sought a determination pursuant to section 17200, subdivision (b)(3) that the second and third amendments were invalid due to a lack of due execution, i.e., that Betty did not sign the amendments. In her section 850, subdivision (a)(3)(A) claim, she sought an order determining that the grant deeds that purported to distribute property from the trust to respondent were invalid and void.

In her response to the petition and in her trial brief, Marlene argued that Stanley had the power of appointment, the right to withdraw community property, and other powers pursuant to the trust. In her objection and response to Harriet's petition, filed July 10, 2009, Marlene argued:

> "Stanley believed that he had the power to distribute certain real property. Specifically, the Trust reserves for Stanley various powers after Betty's death, including the power for Stanley to withdraw, appoint, and distribute his community and separate property by valid trust or testamentary document. . . . [¶] . . . [¶] . . . It was Stanley's intent to make the distributions of property that [Harriet] now seeks to invalidate, not Marlene's. Stanley, as trustee, signed each of the deeds which went to Marlene, all of which were identified in the Third Amendment (which included the properties specifically bequeathed to Marlene under Trust,

18

Section 4, Article Seven) and it was Stanley who decided to distribute the residual of the Trust as he saw fit, not Marlene."

In addition, in her trial brief, filed April 20, 2012, Marlene argued: "Stanley's actions were proper." Specifically, Marlene set forth the headings of her arguments as: "The Only Real Issue Harriet Raises is Whether Stanley Had the Power to Do What He Did" and "Stanley Had the Power to Benefit Marlene As He Did."

In the brief, Marlene acknowledges the trust language indicating that both Stanley and Betty had to sign any amendment or revocation of the trust. However, Marlene points out: "Harriet is wrongly focusing only on those phrases, while ignoring the many other provisions of the lengthy 2000 Trust instrument." Marlene argued, "Considering the 2000 Trust document as a whole, it is clear that the Trustors intended that the surviving 'Trustmaker' (who was Stanley) would have the power to make distributions from the Trust corpus." With this language, Marlene defended the transfers of property pursuant to a broader interpretation of the trust as a whole.

In addition, the parties filed a joint trial statement with a list of disputed issues including: "1. Are the Second and Third Amendments to the Trust Agreement, as signed by Stanley and not Betty, valid? [¶] 2. Are the Second and Third Amendments otherwise valid as estate planning documents by Stanley?"

Finally, respondent's attorney urged in closing argument:

> "As they know and this court is well aware, you have to read every trust as a whole to discern what the intent was. And here, the intent was obvious that Stanley had broad powers to favor Marlene or anyone else. . . . I'm going to briefly address the various powers that are still in the trust. That Stanley had -- he had the power to remove property. There is language in there that Stanley had the unrestricted right to remove separate property and his share of community property. And he could make gifts with it. He could keep it. Also, he could give it away to Marlene or whoever. . . . There are a host of broad provisions in the trust, your Honor, for powers of appointment. Stanley had powers of appointment under every different trust share that was to be created after the death of the first spouse. And, your Honor, there is the provision of a power of the trustee to make gifts."

19

No objection was made to this closing argument. Harriet's lawyer responded to this argument, acknowledging that such powers existed but claiming "they were not exercised."

The record thus reveals that these issues concerning the construction of the trust; whether Stanley properly utilized certain powers under the trust; and Stanley's intent in carrying out the acts in question, were part of the proceedings and that Harriet had ample notice of respondent's theories. As the trial court concluded, given the claims and defenses in this litigation, "'of necessity'" the trial court "'had to construe the trust.'" Regardless of how the issues were framed in Harriet's petition, Marlene's "arguments in her pleadings related to the Trust as a whole." The trial court's factual findings as to the scope of the issues at trial are amply supported by the record.

### C. *The trial court had jurisdiction to consider these issues*

Having determined that the issues at trial included construction of the trust as a whole and Stanley's intent, we now address the question of whether the trial court had the power to address these issues. As set forth below, we conclude that it did.

#### 1. **Harriet's arguments**

Harriet argues that the matters forming the basis for the trial court's decision were beyond the scope of the issues raised by the pleadings and were not within the trial court's power to determine. Harriet claims that her petition served to frame and limit the issues (citing *Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1258 [complaint limits the issues to be addressed at a motion for summary judgment]). Harriet states that the section 17200, subdivision (b)(3) claim in her petition sought a determination that the second and third amendments to the trust are invalid due to lack of execution. Further, she sought an order that the grant deeds that purported to transfer property from the trust to respondent were invalid, of no effect, and void ab initio. Neither of these claims, Harriet contends, sought an interpretation of the trust or an inquiry into Stanley's intent.

In order for the trial court to have had the power to determine (1) the construction of the grant deeds; (2) that the grant deeds were an exercise of a power to withdraw; (3) the construction of the third amendment as a valid living trust agreement; and (4) that the

20

power of appointment was thereby exercised, Harriet argues, respondent would have had to have filed a noticed petition for the construction of instruments pursuant to section 17200, subdivisions (a), (b)(1) and (b)(2). Further, when such orders are sought, Harriet contends, notice must be given to all trustees and beneficiaries at least 30 days before the time set for hearing on the petition. (§ 17203.) Respondent did not carry out these procedural requirements.

Harriet claims that the trial court was not permitted to base its ruling on arguments contained in respondent's objection and response to the petition. Instead, the governing statutes -- in particular, section 17200, set forth specific procedural requirements necessary to obtain such relief.

### 2. Applicable law

Under section 17200, subdivision (a), a " trustee or beneficiary of a trust may petition the court under this chapter concerning the internal affairs of the trust or to determine the existence of the trust." (See also *Mota v. Superior Court* (2007) 156 Cal.App.4th 351, 356, fn. 2.) Section 17200, subdivision (b), sets forth a nonexclusive list of "internal affairs." Included in this list are: "(1) Determining questions of construction of a trust instrument" and "(2) Determining the existence or nonexistence of any immunity, power, privilege, duty, or right." (§ 17200, subd. (b)(1), (2).) Thus, section 17200 permits a trustee or beneficiary to petition the probate court for declaratory relief, seeking an affirmative interpretation of a trust or the powers of the trustee. Significantly, section 17200 is a permissive statute. It provides that an individual "may" proceed pursuant to its authority. It does not contain any language suggesting that a trial court is precluded from construing a trust instrument, or determining the rights of a settlor, in a proceeding brought under any other provision.

Section 17200.1 takes one category of issues out of the realm of section 17200. Section 17200.1 specifies that any proceedings concerning the transfer of property should be conducted under section 850. Section 17200.1 provides: "All proceedings concerning the transfer of property of the trust shall be conducted pursuant to the provisions of Part 19 (commencing with Section 850) of Division 2." "Section 17200.1 broadens the

21

application of section 850." (*Mota v. Superior Court, supra,* 156 Cal.App.4th at p. 356.) It dictates that any proceedings concerning the transfer of trust property shall be conducted pursuant to section 850. There is no language creating any exception where such proceedings involve construction of the trust or intent of the settlor. Under section 17200.1, *all* proceedings concerning the transfer of trust property must be conducted under section 850. Section 17200 is an inappropriate vehicle for such issues.[11]

### 3. Respondent properly defended Harriet's section 850 petition by arguing that the transfers were authorized pursuant to other trust provisions

In her petition, Harriet sought an order declaring the second and third amendments to be invalid pursuant to section 17200, subdivision (b)(3),"Determining the validity of a trust provision." She also sought a determination pursuant to section 850, subdivision (a)(3)(A) that all transfers of real property from the trust to Marlene were invalid.

As set forth above, respondent opposed these two arguments on various grounds. She argued that the second amendment was valid under the disability provisions of the trust; and that Stanley's broad powers under the trust permitted his actions in distributing the trust property. She further argued that the trust document must be construed as a

---

[11] Neither appellants nor respondent mentioned section 17200.1 in the regular briefing filed in connection with this appeal. Therefore, we sought supplemental briefing on the effect of section 17200.1 on appellants' argument that respondent should have filed a petition pursuant to section 17200. In their supplemental briefing, appellants seem to backtrack on their argument that respondent was required to file a petition under section 17200 where, as here, the controversy involves transfers of property out of the trust. Instead, appellants concluded: "In order for Respondent to have claimed entitlement to the properties in question, she would have been required to file a separate petition, under Probate Code section 850, or otherwise, seeking an interpretation, construction and determination as to whether there was an effective exercise of the power of appointment or right of withdrawal. . . . Without such a separate petition and determination, Respondent had no basis for denying the allegations of Appellant Harriet's Probate Code section 850 claim, or setting forth an affirmative defense to it."

Because we conclude that respondent properly defended against Harriet's section 850 petition by arguing that the transfers were proper under other provisions of the trust, it is ultimately irrelevant under which section Harriet claims respondent was required to have filed.

whole, and that Stanley's intent to make the distributions should be a paramount consideration.

Harriet argues that it was improper for the trial court to base its decision on these arguments made by respondent. Harriet interprets the court's order as providing "affirmative relief" to respondent, and argues that a defendant may not seek affirmative relief in an answer, but must raise a request for such relief in a cross-complaint (citing 49A Cal.Jur.3d (2010) Pleading, § 106, pp. 177-178; Code Civ. Proc., § 431.30, subd. (c) ["Affirmative relief may not be claimed in the answer"]). Harriet properly describes affirmative relief as "the allegation of new matter which in effect amounts to a counterattack." (*Simpson v. Superior Court* (1945) 68 Cal.App.2d 821, 825.) However, she fails to specify what *new matter* respondent raised through her arguments.

Harriet raised the question of whether the second and third amendments were valid under the terms of the trust. In doing so she sought an interpretation of the trust. Harriet admits that in support of her argument that the second and third amendments were invalid, she presented "the provisions of the trust that explicitly set forth the procedure for amending the trust." However, those provisions could not be interpreted without reference to the entire trust document. "'In construing a trust instrument, the intent of the trustor prevails and it must be ascertained from the whole of the trust instrument, not just separate parts of it. [Citations.]'" (*Wells Fargo Bank v. Marshall* (1993) 20 Cal.App.4th 447, 453.)

Harriet also sought the return of certain properties transferred out of the trust. By doing so, she put the validity of those transfers at issue. Specifically, Harriet alleged that "[t]he transfers of real property from the Trust to Marlene and or her assignees were in direct violation of the operative terms of the Trust." Respondent was entitled to respond to Harriet's arguments by pointing out provisions of the trust which suggested that Stanley had the authority to make those transfers. Respondent's arguments controverted Harriet's claims.

Harriet won her section 17200 claim. The trial court interpreted the trust and declared that the second and third amendments were invalid as amendments to the trust.

23

However, Harriet lost on her section 850 claim.  The trial court refused to transfer the properties back to the trust.  Instead, the court found that Stanley had the authority to make those transfers pursuant to other powers granted to him by the trust.  The result was a denial of Harriet's request for an order declaring the transfers invalid.  No affirmative relief was granted to respondent on this issue.

Having challenged the amendments and the property transfers as invalid under the trust, Harriet may not artificially limit the scope of the court's review to the provisions of the trust that she finds helpful.  By putting the trust at issue, Harriet put all provisions of the trust at issue.  (See, e.g., *Gionfriddo v. Major League Baseball* (2001) 94 Cal.App.4th 400, 416 [plaintiffs' complaint, claiming violation of statute, put entire statute in issue, including subdivision not expressly named in pleadings].)  In addition, respondent raised defenses related to other powers set forth in the trust, and the court was required to consider those defenses.  "Petitioner's contention that plaintiff's recovery, if any, must have been based only on the allegations of his complaint is not tenable.  In determining the issues raised, the pleadings of *both* parties must be considered.  [Citation.]"  (*Estrin v. Superior Court* (1939) 14 Cal.2d 670, 676.)  Those pleadings must be "liberally construed, with a view to substantial justice between the parties."  (Code Civ. Proc., § 452).  Under the circumstances of this case, there can be no doubt that the interpretation of the entire trust document, and the powers it conferred, were properly before the court.

In addition, respondent has provided citations to law suggesting that it would have been inappropriate for her to have filed a petition pursuant to section 17200 because the question of the proper interpretation of the trust was already before the court pursuant to Harriet's petition.  "The declaratory relief statute should not be used for the purpose of anticipating and determining an issue which can be determined in the main action.  The object of the statute is to afford a new form of relief where needed and not to furnish a litigant with a second cause of action for the determination of identical issues."  (*General of America Ins. Co. v. Lilly* (1968) 258 Cal.App.2d 465, 470-471.)  Because the validity of the second and third amendments, and the validity of the transfers of property, were already put in issue in Harriet's petition, it would have been inappropriate and duplicative

24

for respondent to seek declaratory relief under section 17200. Thus, even if the property transfers could have properly been litigated under that provision -- which, pursuant to section 17200.1, they could not -- respondent correctly declined its use.

### 4. The cases cited by appellants are distinguishable

Appellants cite several cases in support of their theory that the trial court went beyond the scope of the matters raised by the pleadings. As set forth below, all of the cases are distinguishable.

First, Harriet insists that the issues raised by a denial are limited to the allegations of the complaint. She cites *FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 383-384 (*FPI*)). *FPI* was an action on a promissory note. The defendants provided a general denial with affirmative defenses asserted in a conclusory fashion. However, in discovery defendants admitted that they had executed the note and had not made payment. Plaintiffs moved for summary judgment. At the hearing on the motion, the court ruled inadmissible based on the parol evidence rule, defendants' asserted defense of an oral, unmet condition. The Court of Appeal agreed, finding that such a defense was inconsistent with the defendants' admissions. (*Id.* at pp. 396-397.) Here, respondent has not asserted a defense outside the terms of the trust. Instead, she has simply alleged that other provisions of the same document authorized the property transfers at issue. These allegations amounted to a denial of Harriet's claims that the transfers were invalid.

Harriet cites *Estate of Jenanyan* (1982) 31 Cal.3d 703 (*Jenanyan*) as an example of a case where a probate court exceeded its jurisdiction in deciding issues not presented by the petition. The proceeding involved an estate administrator's petition to the court for instructions regarding abatement where the estate had insufficient funds for the bequests. While abatement of the petitioner's real property bequest was not discussed at the hearing, it was later determined that her real property bequest should abate proportionally. The petitioner wrote to the court, objecting to this decision, to which the court responded that the matter had already been heard and ruled upon. (*Id.* at pp. 707-708.)

While the petitioner received notice of the petition regarding abatement, it was insufficient to notify her that her own bequest might be subject to abatement. Specifically, petitioner argued that it was clear from the face of the petition that the administrator did not intend to include real property bequests in his request for abatement instructions. (*Jenanyan, supra*, 31 Cal.3d 703 at p. 709.) The Supreme Court determined that the petitioner's claim had merit, finding that "a court order can be challenged for lack of notice where the order goes beyond the issues framed by the petition." (*Ibid.*)

Again, this is not the situation before us. Respondent's responses to the petition addressed the issues raised in the petition. Respondent explained her theories as to why the amendments were valid, as well as why the transfers of property were valid. Harriet had ample notice of respondent's theories and the provisions of the trust upon which she relied for her arguments.

Similarly, in *Gangwish v. Workers' Comp. Appeals Bd.* (2001) 89 Cal.App.4th 1284, the Workers' Compensation Appeals Board rejected the workers' compensation judge's rationale in rejecting a portion of the plaintiff's claim, instead introducing its own rationale not raised previously in the proceedings. The Court of Appeal found that the plaintiff's due process rights were violated when the matter was decided "on a completely different theory than presented by the parties, without affording a chance for rebuttal." (*Id.* at p. 1295.) Here, in contrast, Harriet had the opportunity to -- and did -- address respondent's theories.

Harriet cites *Lang v. Klinger* (1973) 34 Cal.App.3d 987 and *Marsh v. Edelstein* (1970) 9 Cal.App.3d 132, for the proposition that the court may not determine legal documents to be other than what they purport to be on their face. In both cases, the court refused to decree title to property on a theory of equitable conversion. No such theory is relevant here. The trial court interpreted the trust agreement, and determined the validity of the property transfers, as requested by Harriet.

In sum, Harriet has failed to convince this court that the trial court was precluded from construing the trust and/or ascertaining Stanley's intent in amending the trust and

26

transferring the properties. These issues were before the court and the court properly considered and ruled on them.

## II. The court's interpretation of the trust

Appellants next argue that the trial court erred when it interpreted the trust and the grant deeds and determined that Stanley exercised his powers under the trust.[12] Appellants argue that the grant deeds were not valid exercises of Stanley's right to withdraw property, and the invalid third amendment was not an exercise of Stanley's limited power of appointment. Finally, appellants argue that returning the properties to the trust was not a useless act.

### A. Standard of review

Generally, "'[t]he interpretation of a written instrument, including a . . . declaration of trust, presents a question of law unless interpretation turns on the competence or credibility of extrinsic evidence or a conflict therein. Accordingly, a reviewing court is not bound by the lower court's interpretation but must independently construe the instrument at issue. [Citations.]' [Citations.]" (*Scharlin v. Superior Court* (1992) 9 Cal.App.4th 162, 168 (*Scharlin*).) Further, "[i]n construing a trust instrument, the intent of the trustor prevails and it must be ascertained from the whole of the trust instrument, not just separate parts of it. [Citation.]" (*Ibid*.)

Our review of the court's application of the Probate Code to undisputed facts is a question of law which is subject to de novo review on appeal. (*Community Youth, supra*, 170 Cal.App.4th at p. 427.)

To the extent that the trial court made factual determinations in ascertaining the parties' intent, such factual rulings are reviewed under the substantial evidence test. (*Winograd, supra*, 68 Cal.App.4th at p. 632.)

---

**12** We note that appellants only challenge three grant deeds. We assume that the Palms Boulevard and Lincoln Boulevard properties are not at issue, since those were to become Marlene's pursuant to the uncontested first amendment to the trust. Thus, the properties at issue are the two properties on Washington Boulevard and the corner lot on Abbot Kinney Boulevard and Venice Boulevard.

27

### B. Stanley's powers under the trust

In order to address appellants' claims, we briefly review the significant terms of the trust. As correctly noted by the trial court, the trust, overall, "demonstrates that [Stanley] and [Betty] intended to maintain extensive freedom over the management and control of Trust property." The first section of the trust contains the following broad language:

> "Notwithstanding anything in our trust to the contrary, when we are serving as Trustees under our trust, either of us may act for and conduct business on behalf of our trust as a Trustee without the consent of any other Trustee."

While they were both living, Stanley and Betty had the absolute right to remove as much of their respective interests in the community property of the estate as they requested in writing at any time. They also had the absolute right to amend or revoke the trust. However, after the death of one of them, the trust was not subject to amendment or revocation. While the trust contained restrictions on gifts of principal or income from the community estate, it also contained the following exception:

> "Any gift made directly by our Trustee to a third party in violation of these provisions shall be construed as a distribution made directly to either or both of us, and then a gift from one or both of us to such third party."

The death of Betty triggered the following terms of the trust: the trust would split into two separate trusts, the Marital Trust (divided into two shares) and the Family Trust.

The Marital Trust consisted of Stanley's interest in the community portion of the trust property, Stanley's separate portion of the trust property, and a fractional share of Betty's trust property, which was to be calculated in order to take advantage of certain tax laws. The balance of trust property was to go to the Family Trust.

Stanley's community interest share of the trust property, as well as his separate property, went into Marital Share One, and the balance of the property in the Marital

28

Trust (the fractional share of Betty's interest in the trust property) went into Marital Share Two.[13]

Stanley, as trustee, had "complete authority to make allocations of the deceased Trustmaker's trust property between the Marital and Family Trusts." Stanley had authority, in his "sole and absolute discretion," to make allocations "in any proportion . . . between the two trusts."

After Betty's death, Stanley had the right to withdraw from Marital Share One any amount, at any time, as he should request in writing. "No limitation" was placed on Stanley's right to withdraw "as to either the amount of or reason for such invasion of principal."[14] Stanley also had:

> "the unlimited and unrestricted general power to appoint, by a valid last will and testament or by a valid living trust agreement, the entire principal and any accrued and undistributed net income of Marital Share One as it exists at the surviving Trustmaker's death."

In exercising this general power of appointment, Stanley was required to specifically refer to this power.

Stanley had a similar power of appointment as to Marital Share Two:

> "The surviving trustmaker shall have the limited testamentary power to appoint to or for the benefit of our descendants, either by a valid last will and testament or by a valid living trust agreement, all or any portion of the principal and any accrued and undistributed net income of Marital Share Two as it exists at the surviving Trustmaker's death.

---

[13]    However, if any allocation under the trust resulted only in the funding of Marital Share One, the trustee was directed to administer the agreement as if Marital Share Two did not exist. Appellants have made no effort to inform the court as to the allocation of the trust property at the time the transfers were made.

[14]    Because appellants have made no effort to inform the court as to the allocation of the trust property at the time the transfers were made, it is impossible for the court to ascertain the value of Stanley's interests in Marital Share One or the allocation of funding between Marital Share One, Marital Share Two, and the Family Trust. We assume for the purposes of this discussion that each share of the Marital Trust, as well as the Family Trust, had certain percentage interest in the properties at issue.

29

"The surviving Trustmaker may make distributions among our descendants in equal or unequal amounts, and on such terms and conditions, either outright or in trust, as the surviving Trustmaker shall determine."

Stanley's power of appointment as to the Family Trust was identical to that of Marital Share Two.

In addition, Stanley had the power to make distributions from the Family Trust to his descendants, in his "sole and absolute discretion," to the extent that he felt that such distributions were "necessary or advisable for their education, health, maintenance, and support." Such distributions did not have to be fair or equal:

"Our Trustee may make distributions to or for the benefit of one or more of the beneficiaries of the Family Trust to the complete exclusion of the other beneficiaries. These distributions may be made to a beneficiary or beneficiaries in equal or unequal amounts according to the respective needs of our beneficiaries."

The Family Trust terminated upon the death of the surviving trustmaker.

### C. Stanley had the power to benefit Marlene as he did

The question before us is whether the properties at issue must be returned to the trust. For the reasons set forth below, we find that they do not.

### 1. Marital Share One -- power to withdraw principal

Stanley had the power to remove from Marital Share One any amount, at any time, as he should request in writing, without limitation. There was no limit on the amount of property that Stanley was permitted to withdraw from Marital Share One, and there was no limit on the reason for such a withdrawal from Marital Share One.

Appellants argue that the trust expressly states that any amounts from the principal of Marital Share One can be paid out to the surviving trustmaker as he or she may request in writing. Appellants protest that Stanley did not make a written request to withdraw his community property share. Therefore, they argue, Stanley did not exercise his power of withdrawal.

We disagree. There is no direction in the trust as to the form, content or timing of any such writing. Therefore we interpret this provision broadly to carry out the intent of

the trustmakers, which was to give Stanley and Betty extensive freedom over the trust property. (*Scharlin, supra*, 9 Cal.App.4th at p. 168.) Stanley notated a list of properties in the presence of his attorney, signing and dating it on February 18, 2004. This document exhibited his intent that the subject properties should become Marlene's. In addition, while the third amendment is invalid as an amendment to the trust, it also serves as a writing expressing Stanley's desire that the certain of the subject properties become Marlene's (among others).[15]

Appellants further argue that these were distributions from the trust, not withdrawals. Appellants point out that pursuant to the grant deeds, the property was distributed to respondent, not Stanley. Thus, appellants conclude, it is error to state that Stanley was exercising his right to withdraw. Again we disagree. There is no language mandating that withdrawals under this power must go directly to Stanley. Instead, such withdrawals are without limit "as to either the amount of or reason for such invasion of principal." This broad language indicates an intent to allow Stanley to withdraw for any reason, including to make a gift or distribution, and there is no requirement that any such gift or distribution be first deeded to Stanley.[16]

Appellants further argue that the withdrawal was not for Stanley's benefit, as required by the trust. Specifically, the trust provides:

---

**15** We note that the third amendment refers to two properties at "708 Washington Street (Venice)" and "700 Washington [Street] (Venice)." We assume that the trial court understood that Stanley meant to identify the properties at 700-706 Washington Boulevard and 708-716 Washington Boulevard, which were deeded to Marlene on July 20, 2004. The parties have not made reference to this discrepancy. The trial court made an implied finding that the third amendment covered the two Washington Boulevard properties, and any objection to this finding is forfeited at this time.

**16** In fact, language in the beginning of the trust document suggests that the trustmakers did not intend for either of them to engage in any formal process in order to do what they wanted with the trust property. While there were limits on gifts during the trustmakers' lifetimes, "Any gift made directly by our Trustee to a third party in violation of these provisions shall be construed as a distribution made directly to either or both of us, and then a gift from one or both of us to such third party."

31

"Our trustee shall pay to or apply for the surviving Trustmaker's benefit such amounts from the principal of Marital Share One as the surviving Trustmaker may at any time request in writing.

"No limitation shall be placed on the surviving Trustmaker as to either the amount of or reason for such invasion of principal."

Thus, while the trust provides that the trustee shall make such withdrawals for the surviving trustmaker's benefit, it also expressly provides that there is "no limitation" on the reason for such invasion of principal. Interpreting these two paragraphs together, in context with the agreement as a whole, we find that Stanley was not required to articulate a specific benefit to himself for these withdrawals, nor does the court need to make a finding that these withdrawals provided a specific benefit to Stanley in order to uphold them. Stanley had the power to withdraw for any reason.[17]

In sum, we find that Stanley had the power to deed the properties at issue to Marlene under his very broad power to make withdrawals from Marital Share One. Thus, as to the percentage of the interest in the properties at issue held by Marital Share One, we conclude that Stanley had the authority to withdraw those properties at any time, for any reason.

### 2. Marital Share Two -- power of appointment

As to the percentage interest in the properties held by Marital Share Two, we find that Stanley exercised his power of appointment and that the properties would have properly passed to Marlene upon Stanley's death.

The trust provided that Stanley had the "limited testamentary power to appoint to or for the benefit of our descendants, either by a valid last will and testament or by a valid living trust agreement, all or any portion of the principal and any accrued and undistributed net income of Marital Share Two as it exists at the surviving Trustmaker's death." We find that while the third amendment was invalid as an amendment to the trust, it was valid as a living trust agreement.

---

[17]    One might speculate that these withdrawals benefitted Stanley by giving him peace of mind that the property would be distributed as he wished.

A trust may be created where there is "[a] declaration by the owner of property that the owner holds the property as trustee." (§ 15200, subd. (a).) Stanley declared himself trustee of the property in the very first paragraph of the third amendment. Through this declaration of trust, he created a valid living trust pursuant to section 15200, subdivision (a), and properly exercised his power of appointment for the benefit of Marlene.[18]

A trust may also be created where there is "[a] transfer of property by the owner, by will or by other instrument taking effect upon the death of the owner, to another person as trustee." (§ 15200, subd. (c).) Stanley captioned the third amendment as an amendment to an existing trust, adding certain properties that were to be distributed to Marlene upon his death. The third amendment purported to amend article 7, section 4, which concerned specific distributions to occur on the death of the surviving trustmaker. Thus, Stanley evidenced an intention to create an "instrument taking effect upon the death of the owner." (§ 15200, subd. (c).)

The document also stated:

> "2. It is the desire of the Trustors that Marlene J. Marcus, in her sole and absolute discretion, after payment of all expenses and taxes, distribute a portion of the net income derived from the real properties which she is to receive from the Trust described above, to the daughters of the Trustors, Harriet Joyce Marcus and Loretta A. Patakas.

> "3. It is the further desire of the Trustors that the Trust distribute to the sons of the Trustors, Norman B. Marcus and Steven A. Marcus, after payment of all expenses and taxes, the following real property: the San

---

[18] Appellants protest that Stanley was not the "owner" of the property -- technically title to the property was held by the trust. Therefore, appellants argue, the requirements of section 15200, subdivision (a) are not met. Even if the trust technically held title to the properties at issue, Stanley was the beneficial owner of the property at the time he executed the third amendment. (*Parkmerced Co. v. City and County of San Francisco* (1983) 149 Cal.App.3d 1091, 1094 [entity or individual may own bare legal title to property for the owner of its beneficial interest]; *Empire Properties v. County of Los Angeles* (1996) 44 Cal.App.4th 781, 787 [where a trust is irrevocable, "trust beneficiaries acquire a vested and present beneficial interest in the trust property"].) Thus, he was entitled to create a living trust as to his interest in the property.

Marcos Desert Hot Springs Lot; the G-4 Sierra Hwy property; the Lake Los Angeles lot; the Salton Sea lot #525; and the 14 acre and 20 acre parcels in Rosamond, CA.

"[¶] . . . [¶]

"5.  It is intended that the real properties be distributed as set forth above, whether title is in the name of (a) the Trustors, (b) the Trust, or (c) Stanmar Partners, L.P."

Stanley signed the document as trustee.  It was also notarized.

By executing the third amendment, Stanley transferred his interest in the property though an instrument taking effect upon his death, to Marlene as trustee.  Specifically, in her sole discretion, Marlene was to distribute a portion of the net income of those properties to Harriet and Loretta.  Marlene had a duty to administer the property in accordance with the document for the benefit of Harriet and Loretta.  As such, Marlene was designated to act as a trustee of that property.  (§ 16000 ["the trustee has a duty to administer the trust according to the trust instrument"].)  Thus, the requirements of section 15200, subdivision (c) were met.

Finally, a trust may be created where there is an "exercise of a power of appointment to another person as trustee."  (§ 15200, subd. (d).)  The third amendment is a valid living trust under this definition.  Under the plain language of the trust, Stanley had a power of appointment as to both shares of the Marital Trust and the Family Trust. With the third amendment, he exercised this power of appointment and expressed an intent that Marlene act as trustee of the list of properties distributed to her.  Thus, the requirements of section 15200, subdivision (d) were met.

Appellants correctly point out that section 15201 specifies that "[a] trust is created only if the settlor properly manifests an intention to create a trust."  We find that such an intent is communicated through the third amendment.  Specifically, as set forth above, Stanley declared himself trustee of the properties at issue.  In addition, Marlene was to act as trustee for a portion of the net income earned from the list of properties passed on to her, and, in her sole discretion, distribute a portion of such income to Harriet and

Loretta. Thus, Marlene was charged with administering a portion of the income from the properties in trust. The criteria set forth in section 15201 is met.

Appellants also argue that the requirement of section 15202 is not met. Section 15202 provides: "A trust is created only if there is trust property." As it is with section 15201, we find that this requirement is met. The trust property at issue was listed within the third amendment. Appellants argue that this property was already in trust, and could not be subject to a new valid living trust. Appellants cite no authority for their position. On the contrary, the express terms of the trust provided that Stanley could use his power of appointment to create a new, valid living trust as to any of the property already in the trust.

The third amendment satisfies the requirements of a valid living trust under section 15200, subdivisions (a), (c), or (d). Pursuant to this valid living trust, any portion of the interest in the properties at issue remaining in Marital Share Two passed to Marlene upon Stanley's death.

### 3. The Family Trust -- power to distribute and power of appointment

As to the remaining interest in the properties held by the Family Trust, Stanley had the power to distribute this property both while he was living and through a power of appointment upon his death.

While Stanley was alive, he had the ability to "distribute to or for the benefit of the surviving Trustmaker and our descendants as much of the net income and principal of the Family Trust as our Trustee, in [his] sole and absolute discretion, shall consider necessary or advisable for their education, health, maintenance, and support." Stanley was permitted to exercise this power "to or for the benefit of one or more of the beneficiaries of the Family Trust to the complete exclusion of the other beneficiaries."

Appellants do not address Stanley's power to make distributions under the Family Trust. Instead, they argue that any issue of Stanley's exercise of powers under the trust was not raised in Harriet's petition. As explained in section I, Harriet's request that the court return certain properties to the trust raised the issue of whether Stanley had the authority to make those transfers. Under the provisions governing the Family Trust, he

had the authority, in his sole and complete discretion, to make the distributions of property that he made to Marlene. Thus, as to the percentage of the interest in the properties at issue held by the Family Trust, we conclude that Stanley had the power to distribute such property at any time to Marlene in his sole discretion.

In addition, the trust gave Stanley a power of appointment as to the assets in the Family Trust. The language describing this power of appointment is identical to the language describing his power of appointment over the assets in Marital Share Two. As explained in detail in section II.C.2 above, this power of appointment was properly exercised through the third amendment, which constitutes a valid living trust. Thus, even if Stanley had not had the power to distribute the assets in the Family Trust during his lifetime, they properly passed to Marlene upon his death pursuant to the third amendment.

### D. The trial court's "useless act" finding

Stanley had the power to transfer from Marital Share One and the Family Trust during his lifetime, but only had the power to transfer from Marital Share Two upon his death. The trial court determined that even though the properties at issue were transferred in full at a time when Stanley was still living, those properties should not be returned to the trust only to be re-distributed to Marlene pursuant to Stanley's power of appointment. Specifically, the court stated:

> "[Stanley's] intent was crystal clear. [Stanley] and [Betty] favored [Marlene] over all of their other children. While [Stanley] had no authority to transfer Marital Trust Share Two to [Marlene] during his lifetime, he did have the complete authority to ultimately accomplish his goal of distributing property to her in her individual capacity. As [Marlene] has assumed all liability for the fees and costs associated with the administration of the Trust, it would be a useless act to have her return to the Trust property from Share Two of the Marital Trust only to have the Trust distribute the property back to [Marlene] pursuant to [Stanley's] limited power of appointment."

Appellants challenge this "useless act" finding. Appellants argue that the trial court's premise that the trust property would necessarily be distributed back to Marlene is

erroneous. Appellants point out that Marlene has been ordered by the court to provide an accounting, which has not been filed. Appellants argue that until such time as the accounting is filed and examined, the trial court could not be in a position to determine that the return of the properties to the trust would be a useless act. Appellants point out that the accounting could reveal facts constituting grounds for a surcharge against Marlene as trustee, thereby invalidating the trial court's useless act finding.

Appellants' argument is essentially factual: they suggest that facts might be revealed in the future mandating a different outcome. But the argument is based on pure speculation. Appellants point to no evidence suggesting that Marlene will face a surcharge.[19] In addition, appellants point to no law suggesting that an appropriate remedy for a breach of trust is return of property bequested to the trustee. These arguments fail to convince us that the trial court erred.

The evidence supports the trial court's determination that returning the properties to the trust would be a useless act. Even if it was not within Stanley's authority to transfer the properties in full to Marlene during his lifetime, the same outcome would have resulted had he not done so. Upon his death in October 2004, just a few months after he executed the deeds, the properties would have passed to Marlene through Stanley's exercise of his power of appointment. Appellants present no specific evidence to the contrary and their speculation as to a possible breach of trust by Marlene is insufficient to necessitate reversal. (See *California Assn of Medical Products Suppliers v. Maxwell-Jolly* (2011) 199 Cal.App.4th 286, 308 ["'Speculation or conjecture alone is not substantial evidence'"].) Therefore, we find there is no basis to reverse the trial court's order denying Harriet's request that the properties be returned to the trust.

---

**19**    The trial court denied Harriet's request that Marlene be removed as trustee, finding no grounds for such a removal. This finding suggests that there was no evidence that Marlene had failed to administer the trust according to the trust instrument.

**III. The trial court's order to transfer the Columbia River Storage property back to the trust**

Appellants' next argument involves the trial court's ruling on Marlene's cross-petition to enforce the consent agreement.

### A. Terms of the consent agreement

In short, the consent agreement provided that Loretta and Harriet "consented" to certain documents and actions, and would not, "directly or indirectly, either individually, or together, seek to attack, challenge, invalidate, set-aside, modify, or nullify" those documents and actions. Included in the list of documents and actions were the second amendment, the third amendment, "[a]ny other document or written directive executed by Stanley and/or Betty Reva Marcus," and "[a]ny action taken by Stanley and/or Betty Reva Marcus regarding the use or disposition of any of their real or personal property held individually, in the name of the Stanmar Trust, or in the name of Stanmar Partners, L.P., a California limited partnership."

As consideration for such consent, Harriet and Loretta would each receive from the trust and/or Stanmar Partners, L.P., "a one-half tenancy in common interest . . . free of estate taxes, the use of Stanmar's cash balance with Asset Preservation, Inc. as is necessary to purchase in accordance with the tax deferred exchange provisions of IRC Sec. 1031 for $750,000 the 90+ unit Columbia River Storage" property.

Both Harriet and Loretta signed the consent agreement and returned it to Marlene's attorney, Fenmore. Marlene purchased the Columbia River Storage property, and Loretta performed all due diligence concerning the purchase. On November 4, 2004, Marlene as trustee of the trust transferred the real property to Harriet and Loretta, in equal shares. Within one year, Harriet sold her interest in the Columbia River Storage property to Loretta.

### B. The trial court's ruling

The trial court ruled that "the Consent Agreement is voidable as it is a transaction between a trustee and beneficiaries." As trustee, Marlene was "required to demonstrate that the transaction was fair and that the beneficiaries had a full understanding of the

38

transaction." The trial court found that Marlene rushed Harriet and Loretta and did not advise them to seek legal counsel before signing the agreement. Thus, Marlene "did not meet her burden of demonstrating that the transaction between her, the trustee, and the beneficiaries was a fair one where the beneficiaries had complete knowledge of the all of the relevant facts." The trial court determined that the consent agreement is not valid and enforceable, and ordered that Harriet and Loretta return the Columbia River Storage property to Marlene as trustee. The court ordered that Harriet and Loretta provide an accounting for such property. Because the agreement was deemed void, the parties' requests for attorney fees were denied.

### C. *The trial court did not err in declaring the contract void*

#### 1. Arguments below

In her preliminary response to Harriet's petition, Marlene pointed out to the court that even if the consent agreement were found to be unenforceable, Harriet and Loretta would be required to return the Columbia River Storage property:

> "It bears noting that, if for any reason the Court ultimately finds the Contract is not enforceable, Marlene would be entitled to a pro-rata reimbursement of all the estate and gift taxes and interest she paid, plus a host of legal, accounting and interest charges and other administrative costs. Also, [Harriet] and Loretta would be required to return the money they received, in addition to the return of any other assets obtained through use of or investment of Trust funds, including any other property purchased with the proceeds of the monies received."

In her cross-petition, Marlene sought to enforce the consent agreement. Marlene argued that Harriet breached the terms of the consent agreement when she filed suit against Marlene in violation of the terms of the consent agreement. Marlene argued that Harriet and Loretta should be required to return all consideration they received pursuant to the agreement, together with any profits accruing to such property.

In response, appellants argued that the consent agreement cannot be enforced. Among other things, they argued that the contract was unconscionable. Appellants argued that the elements of oppression and surprise were present at the time that they signed the contract. Marlene had superior bargaining power and appellants had no

39

meaningful choice. In addition, appellants were pressured into signing the document under threat that they would lose everything if they did not. Appellants admitted, "If the Court finds that the Consent was unconscionable at the time it was made, it may refuse to enforce it." In their conclusion, appellants asserted: "The Consent is not enforceable, and should not be enforced." In addition, in their trial brief, appellants argued that "Marlene's breach of fiduciary duty and conflict of interest raise a presumption of fraud in procuring the Consent Agreement rendering it voidable, and it should not be enforced."

## 2. The trial court did not err in declaring the agreement void and ordering return of consideration

We find that the trial court acted properly in ordering that the contract be declared void and ordering appellants to return the property they received under the contract. Appellants, in defending against the cross-petition, raised questions as to the enforceability of the contract. The court was tasked with reviewing the facts surrounding the formation of the contract to determine whether it was enforceable or not under the applicable laws. Given the facts surrounding the execution of the consent agreement, the court found that appellants did not have "a complete understanding of all of the facts relevant to making an informed and voluntary decision."

Under the circumstances, the consent agreement was voidable at the election of the beneficiaries:

> "'[I]f a contract is entered into between a trustee and his beneficiary through which the former gains an inequitable advantage . . . , the latter is entitled to rescind the contract, subject to the limitations imposed by the law governing the application of this remedy. Such contract, however, is not void, but is voidable at the election of the beneficiary.' [Citation.]"

(*BGJ Associates v. Wilson* (2004) 113 Cal.App.4th 1217, 1229, citing *Estate of Berry* (1925) 195 Cal. 354, 362.)

Where, as here, the trustee has rushed her beneficiaries into signing a contract without advising them to seek legal counsel before acting, the contract is "'voidable only

at the option of the beneficiary, who may either affirm or repudiate it.'  [Citations.]" (*BGJ Associates v. Wilson, supra*, 113 Cal.App.4th at p. 1229.)

The facts of this matter show that appellants opted to void the contract.  They breached the terms of the contract by challenging the actions taken by Stanley, and they defended against Marlene's petition to enforce the consent agreement by arguing that the agreement was not enforceable.  These facts support the trial court's implicit finding that appellants chose to void the contract rather than ratify it.  Under the circumstances, in order to escape from their obligations, appellants must "'offer to restore the consideration received.'"  (*Ford v. Shearson Lehman American Express, Inc.* (1986) 180 Cal.App.3d 1011, 1028; see also Civ. Code, § 1691, subd. (b) [to effect a rescission, rescinding party must "[r]estore to the other party everything of value which he has received from him under the contract"].)

We also agree with the trial court that even if the consent agreement is not considered void, appellants must still return the Columbia River Storage property to the trust.  Appellants breached the agreement when Harriet filed her petition arguing that the second and third amendments were invalid.  This action violated appellants' promise not to "seek to attack, challenge, invalidate, set-aside, modify, or nullify" those amendments. Under the terms of the contract, the remedy for such a breach is that appellants must "immediately transfer to the Stanmar Trust any property or successor property which they acquired with the use of Stanmar's funds . . . described above."

### 3. The trial court did not improperly grant rescission

Appellants argue that Marlene did not seek rescission of the contract.  Instead, she sought to enforce it.  Appellants are correct.  However, appellants themselves argued that the contract was not enforceable.  Specifically, they argued that Marlene had superior bargaining power and that appellants were pressured to sign the agreement without consulting a lawyer.  Because the consent agreement existed between a trustee and beneficiaries of the trust, a presumption of undue influence arose, making the agreement voidable at the election of the appellants.  (*BGJ Associates v. Wilson, supra*, 113 Cal.App.4th at p. 1229.)  Appellants repudiated the contract through their actions, and

41

were permitted to assert rescission as a defense to Marlene's petition to enforce the agreement. (Civ. Code, § 1692 ["When a contract has been rescinded in whole or in part, any party to the contract may seek relief based upon such rescission by . . . (b) asserting such rescission by way of defense or cross-complaint"].) By arguing that the contract was unenforceable due to Marlene's undue influence, appellants sought rescission. (Civ. Code, § 1689, subd. (b)(1) [contract may be rescinded "[i]f the consent of the party rescinding . . . was given by mistake, or was obtained through duress, menace, fraud, or undue influence, exercised by or with the connivance of the party as to whom he rescinds"].) The trial court agreed with appellants that the contract was unenforceable, and declared it to be void. Appellants' argument that such relief is inappropriate is disingenuous, considering that it was appellants who sought to declare the consent agreement unenforceable.

The cases cited by appellants do not assist their argument. Appellants first cite *Harris & Hull, Inc. v. McCarty-Vaughan-Evans Corporation* (1929) 102 Cal.App. 461 (*Harris*). In *Harris*, the contract at issue was declared to be illegal and void. The court ordered return to the plaintiff of the money paid under the contract. The case supports the trial court's conclusion that, where a contract is declared void, consideration must be returned. Appellants attempt to distinguish *Harris* on the ground that this was an action to enforce a contract. The distinction is ineffective, because the *Harris* case was an action for specific performance on a contract. (*Id.* at p. 463.) As here, the *answer* alleged that the contract was void. The *Harris* court agreed that the contract was void and thus denied specific performance, but awarded the plaintiff return of the money that he had paid on the contract. The *Harris* case thus supports the trial court's conclusion that when a contract is declared void, the consideration exchanged must be returned.

Appellants also cite *Estate of Vokal* (1953) 121 Cal.App.2d 252, 257 (*Vokal*), for the proposition that "a trustee . . . may not obtain any advantage by the slightest misrepresentation . . . . Any violation of such duties constitutes a fraud against the beneficiaries. [Citations.]" The *Vokal* case concerned a trustee's accounting, in which it was revealed that the trustee overcharged the trust for his services. In discussing the

42

trustee's violations, the court set forth the obligations of a trustee to his beneficiary. The case thus has little relevance to the matter before us. Appellants argue that because Marlene breached her duties to appellants, she was not in a position to bring a cause of action for rescission against appellants. Again, this is irrelevant. Marlene did not bring a cause of action for rescission; it was appellants who argued that the consent agreement was unenforceable.

**4. Appellants were not prejudiced by delay, as it was appellants who sought to void the agreement**

Next, appellants argue that they were prejudiced due to the delay of nearly eight years in which they relied upon their ownership of the property. We reject this argument as well. It was Harriet who initiated this action, four years after Stanley's death and four years after she signed the consent agreement. Marlene raised the consent agreement as a cross-claim to Harriet's action. Any delay is properly attributed to appellants, not Marlene. The cases cited by appellants do not dictate a different outcome under the facts of this case. (*Doctor v. Lakeridge Constr. Co.* (1967) 252 Cal.App.2d 715, 720-721 [party must promptly, upon discovering facts entitling him to rescind, give notice of rescission to the party as to whom he rescinds]; *Citicorp Real Estate v. Smith* (9th Cir. 1998) 155 F.3d 1097, 1104 [defendants were not permitted to amend counterclaim to seek additional remedy of rescission one year and nine months after the underlying actions were filed].)

Appellants cite no law suggesting that they may claim prejudice based on delay under the circumstances of this case.

**5. There was no finding of unclean hands**

Appellants next argue that the trial court should not have granted rescissionary relief to Marlene because Marlene was the wrongdoing party. We reject appellants' argument. First, the trial court ordered appellants to return the property to the trust because *appellants* argued that the consent agreement was void and unenforceable. The trial court did nothing to favor Marlene -- in fact, it ruled against her on her petition to enforce the agreement.

43

Second, appellants point to no place in the record where the issue of unclean hands was raised before the trial court. Application of the doctrine of unclean hands is a matter within the sound discretion of the trial court based on the facts before it. (*Lovett v. Carrasco* (1998) 63 Cal.App.4th 48, 55.) The trial court made no findings on the issue of unclean hands, therefore there is no decision for this court to review. If appellants did not raise this issue before the trial court, it is forfeited on appeal. (*Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 799 (*Deitz*) ["'In order to preserve an issue for appeal, a party ordinarily must raise the objection in the trial court'"].)

Finally, we note that the trial court did not imply that Marlene's actions were substantively wrongful. The court noted, "While the transaction ultimately may have been a fair one resulting in [Harriet] and [Loretta] receiving more than they would be entitled to under the Trust, the trustee had an obligation to treat the beneficiaries with the utmost good faith." Thus, while the court voided the contract at the election of appellants due to procedural improprieties, including Marlene's rushing appellants into signing and failing to advise them to consult an attorney, it appears that ultimately the trial court felt the consent agreement was not substantively unfair to appellants. Again, the question of whether Marlene's actions constituted "wrongdoing" sufficient to warrant a finding of unclean hands is a factual finding for the trial court. Such a factual finding was never made.

### 6. There was no finding that Loretta was a bona fide purchaser

Appellants' final argument is that because Loretta was a bona fide purchaser of Harriet's 50 percent interest in the Columbia River Storage property, Loretta should not be required to return the property to the trust.

Appellants provide no citation to the record suggesting that the trial court considered the question of whether Loretta was a bona fide purchaser of the Columbia River Storage property. "The determination whether a party is a good faith purchaser . . . for value ordinarily is a question of fact." (*Triple A Management Co. v. Frisone* (1999) 69 Cal.App.4th 520, 536.) The trial court made no finding of fact on the question of whether Loretta was a bona fide purchaser of Harriet's interest in the property.

44

Without such a finding, this court has no decision to review. At this stage of the litigation, the issue has been forfeited. (*Dietz, supra*, 177 Cal.App.4th at p. 799 ["'In order to preserve an issue for appeal, a party ordinarily must raise the objection in the trial court'"].)

In sum, appellants have failed to convince this court that the trial court erred in determining that appellants must return the Columbia River Storage property to the trust.

## IV. Denial of appellants' request for attorney fees

Appellants argue that the trial court erred in denying them attorney fees on their successful defense of the only contract claim in the cross-petition. In their objections to the cross-petition, appellants requested both costs and attorney fees. Appellants argue that their request should have been granted pursuant to Civil Code section 1717, subdivision (a).[20]

Appellants point out that the Supreme Court has declared, "when a defendant defeats recovery by the plaintiff on the only contract claim in the action, the defendant is the party prevailing on the contract under [Civil Code] section 1717 as a matter of law. [Citations.]" (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 876 (*Hsu*).) Appellants argue that respondent brought the cross-petition for enforcement of the consent agreement, and that the trial court determined that it was not valid or enforceable. Thus, appellants argue, they should be declared victors on this claim.

Appellants correctly note that "a party is entitled to attorney fees under [Civil Code] section 1717 'even when the party prevails on grounds the contract is inapplicable,

---

[20]    Civil Code section 1717, subdivision (a), provides: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs."

The consent agreement contained the following attorney fee provision: "If any legal action or other proceeding is brought for the enforcement of this document, the prevailing party shall be entitled to recover reasonable attorneys fees and other costs, in addition to any other relief which the party may be entitled."

45

invalid, unenforceable or nonexistent, if the other party would have been entitled to attorney's fees had it prevailed.' [Citations.]" (*Hsu, supra*, 9 Cal.4th at p. 870.) "This rule serves to effectuate the purpose underlying [Civil Code] section 1717," which is mutuality of remedy. (*Ibid.*) To carry out this purpose, "the statute generally must apply in favor of the party prevailing on a contract claim whenever that party would have been liable under the contract for attorney fees had the other party prevailed." (*Id.* at pp. 870-871.)

However, as explained in *Hsu*, Civil Code section 1717 also "vests the court with discretion in making the prevailing party determination." (*Hsu, supra*, 9 Cal.4th at p. 871.) In particular, the trial court may "determine that there is no party prevailing on the contract for purposes of an award of attorney fees." (*Ibid.*)[21] A trial court's determination that neither party prevailed on the contract claim is reviewed for abuse of discretion. (*Nasser v. Superior Court* (1984) 156 Cal.App.3d 52, 59.) Under this standard, the trial court is given wide discretion in making its prevailing party determination. We will not disturb the trial court's ruling on appeal absent a clear abuse of this discretion. (*Ibid.*)

Here, the trial court denied both Marlene's request for attorney fees and appellants' request for attorney fees arising out of the cross-petition. We find that this constituted an implied finding that no party prevailed on the contract action. We further find that under the circumstances of this case, this decision did not constitute an abuse of discretion.

A court may find that there is no prevailing party where the judgment may be considered "'good news and bad news to each of the parties.'" (*Hsu, supra*, 9 Cal.4th at p. 874; see also *Nasser v. Superior Court, supra,* 156 Cal.App.3d at p. 59 [there is no

---

**21** Civil Code section 1717, subdivision (b)(1), provides: "The court, upon notice and motion by a party, shall determine who is the party prevailing on the contract for purposes of this section, whether or not the suit proceeds to final judgment. Except as provided in paragraph (2), the party prevailing on the contract shall be the party who recovered a greater relief in the action on the contract. The court may also determine that there is no party prevailing on the contract for purposes of this section."

46

duty to declare one prevailing party "in cases where the victory and loss is evenly divided"].) In addition, "a party who is denied direct relief on a claim may nonetheless be found to be a prevailing party if it is clear that the party has otherwise achieved its main litigation objective. [Citations.]" (*Hsu*, at p. 877.)

Here, Marlene lost her petition to enforce the consent agreement. Appellants succeeded in having the agreement declared void. However, appellants were ordered to return the Columbia River Storage property to the trust. Enforcement of the consent agreement would have resulted in the same outcome: return of the Columbia River Storage property to the trust. Thus, Marlene achieved one of her main objectives in filing the cross-petition. Under the circumstances, appellants cannot be said to have obtained the "'simple, unqualified win'" which mandates an award of attorney fees. (*Hsu, supra*, 9 Cal.4th at p. 877.)

The *Hsu* court confirmed a trial court's authority to determine that there is no party prevailing on a contract where "the opposing litigants could each legitimately claim some success in the litigation." (*Hsu, supra*, 9 Cal.4th at p. 875.) The trial court did not abuse its discretion in determining that this is one of those cases. No error occurred.

## DISPOSITION

The judgment is affirmed. Respondent is awarded costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.
HOFFSTADT

47